UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILMA NEL TRUMBO,

No. 14-12495

Plaintiff,                          Magistrate Judge R. Steven Whalen

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____/

**OPINION AND ORDER**

Plaintiff Wilma Nel Trumbo ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross motions for summary judgment. For the reasons set forth below, Defendant's Motion for Summary Judgment [Dock. #20] is DENIED and Plaintiff's Motion for Summary Judgment [Dock. #19] is GRANTED, remanding for an award of benefits as of Plaintiff's 55th birthday and remanding for further fact-finding and determination of whether Plaintiff was capable of exertionally light work between the alleged onset of disability date and her 55th birthday.

-1-

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB on February 28, 2011, alleging disability as of January 30, 2002 (Tr. 130-136).  Upon denial of the claim, Plaintiff requested an administrative hearing, held on September 27, 2012 in Detroit, Michigan (Tr. 27). Administrative Law Judge ("ALJ") John J. Rabaut presided.  Plaintiff, represented by attorney John Scott, testified (Tr. 31-49), as did Vocational Expert ("VE") William Kiger (Tr. 50-58).  On January 14, 2013, ALJ Rabaut found that while Plaintiff was unable to perform her past relevant work through the date last insured of December 31, 2007, she could perform a significant range of other work (Tr. 13-22).  On May 1, 2014, the Appeals Council denied review (Tr. 1-5).  Plaintiff filed suit in this Court on June 25, 2014.

# II.   BACKGROUND FACTS

Plaintiff, born November 3, 1950 was 57 on the date last insured of December 31, 2007 (Tr. 22, 130).  She completed 12th grade and received medical assistant training (Tr. 165).  She worked previously as a certified medical assistant (Tr. 165).  She alleges disability resulting from diabetes, hypertension, arthritis, and depression (Tr. 164).

## A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She worked for Henry Ford Health Systems as a medical assistant before becoming disabled (Tr. 31).  Her job involved mostly walking and standing, but due to knee problems, her job was modified allowing her to sit and use a computer as of 1998 or 1999 (Tr. 32).

-2-

She treated the knee condition with steroid injections (Tr. 33). She had not worked since January, 2002 when she received a "severance package" (Tr. 35).

Between 2002 and 2007, her health worsened (Tr. 35). Knee pain prevented her from sleeping for more than one hour at a time (Tr. 43-44). She began taking injections for the condition of diabetes in 2004 or 2005 (Tr. 35-36). She currently controlled her blood sugar levels by eating on a schedule (Tr. 36). She had been cautioned by her ophthalmologist that she should watch her sugar levels due to her eye condition (Tr. 36). She experienced inpaired vision in the right eye, which began in 2004 (Tr. 37-38). She held a valid driver's license but had not driven in over two years (Tr. 40). She had experienced foot tingling for at least 10 years and hand tingling for the past six or seven (Tr. 36). Prior to the expiration of benefits, she gained weight and experienced high blood pressure (Tr. 45). She experienced daily bouts of dizziness due to blood sugar and blood pressure problems (Tr. 46). She required the use of a cane (Tr. 47).

In addition to the physical problems, Plaintiff experienced depression, characterized by sleep disturbances, crying jags, and dislike of being around others (Tr. 39, 42). With the exception of vacuuming, she relied on her husband and daughters to perform housekeeping tasks (Tr. 40). The depression was exacerbated by weight gain (Tr. 45).

As of 2007, Plaintiff was able to sit or stand for one hour before requiring a position change due to knee problems (Tr. 41).

-3-

**B.  Medical Records**

July, 1998 imaging studies of the right knee show "early degenerative arthritic changes" (Tr. 392).  January, 1999 treating records note a diagnosis of osteoarthritis (Tr. 391).  The same month, Plaintiff received two steroid injections to the right knee (Tr. 391).  Plaintiff received additional injections in February, 1999 and November, 2000 (Tr. 386-389).

March, 2004 treating notes by Rafia Haque, M.D. note that Plaintiff had not received treatment in one year and required diabetes medication (Tr. 232).  The treating records note Plaintiff's report of vision impairment with "double vision" (Tr. 232).  The records also note a diagnosis of major depression and anxiety neurosis (Tr. 232).  Dr. Haque's notes state that the eye symptoms were likely attributable to diabetes (Tr. 233).  March, 2005 treating records state that Plaintiff had scheduled bilateral eye surgery (Tr. 240).  Treating records note ankle swelling (Tr. 241).  In October, 2005, Plaintiff reported fatigue as a result of high sugar levels (Tr. 245).  April, 2006 treating records state that Plaintiff was unable to afford lab tests (Tr. 249).

In February, 2007, Plaintiff received emergency treatment after fainting (Tr. 210).  Hospital records note diagnoses of diabetes, hypertension, and cardiac dysrhythmia as well as a history of depression and anxiety neurosis  (Tr. 210, 213, 222).  Plaintiff exhibited a normal range of lower extremity motion with a steady gait (Tr. 213, 215).  April, 2007 records note the conditions of tendinitis and arm pain (Tr. 257).  November, 2007 records state that Plaintiff experienced uncontrolled glucose levels (Tr. 261).

-4-

September, 2008 records note Plaintiff's report of leg swelling (Tr. 264). In November, 2008, Plaintiff reported right knee pain (Tr. 267). August, 2009 records note uncontrolled diabetes (Tr. 272). November, 2009 and April, 2010 records state that Plaintiff experienced osteoarthritis of the knee (Tr. 276).

In February, 2011, Plaintiff sought emergency treatment for left knee pain (Tr. 360). June, 2011 records note left knee pain (Tr. 342). An MRI of the left knee showed osteoarthritis (Tr. 349). In July, 2011, ophthalmologist Kamal Gupta, M.D. noted that Plaintiff was examined in March, 2005, but had not kept follow-up appointments due to financial constraints (Tr. 347). He found Plaintiff's visual prognosis was "guarded" (Tr. 347). In October, 2011, Plaintiff underwent right eye surgery for diabetic retinopathy (Tr. 325).

In June, 2012, Dr Gupta noted that Plaintiff's diabetes was under poor control, resulting in a right retinal hemorrhage causing vision impairment "within the center of her vision" and "multiple dot and blot hemorrhages on the left (Tr. 377). The same month, Dr. Haque completed a work-related assessment on behalf of Plaintiff's application for benefits, finding that she was limited to lifting and carry 20 pounds on an occasional basis (Tr. 378). He found that Plaintiff was limited to sitting, standing, or walking for up to two hours a day respectively (Tr. 379). Dr. Haque noted that Plaintiff required the use of a cane when walking more than "room to room" (Tr. 379). He found that Plaintiff was capable of frequent manipulative movement on the right and on the left, occasional handling, fingering,

and feeling with a preclusion on reaching and push/pulling (Tr. 380). He precluded all climbing, stooping, kneeling, crouching, and crawling but found that Plaintiff could balance on an occasional basis (Tr. 381). He noted that Plaintiff's vision was affected by retinopathy and that she was unable to read small print, a newspaper, or computer screen without magnification (Tr. 381). He precluded work involving unprotected heights, moving mechanical parts, operating a motor vehicle, temperature extremes, and vibrations and found that Plaintiff was limited to occasional exposure to humidity (Tr. 382). He noted that she experienced foot numbness (Tr. 382). Dr. Haque did not indicate that his assessment referred to another period, but in December, 2012 stated that Plaintiff experienced uncontrolled diabetes with diabetic retinopathy and mononeuritis prior to December 31, 2007 (Tr. 383-384).

### C. VE Testimony

VE Kiger classified Plaintiff's former job as a medical assistant as skilled at the light exertional level (exertionally heavy as performed)[1] (Tr. 51). The ALJ then posed the following question, describing a hypothetical individual of Plaintiff's age, education, and work experience:

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

-6-

> Please assume an individual [who] can perform work at . . . the medium
> exertional level. Could not climb ladders, ropes or scaffolds. Would need to
> avoid concentrated use of moving machinery, all exposure to unprotected
> heights. And work would need to be low stress. And I'm going to define that
> for you as having only occasional decision making, only occasional changes
> in the work setting. Could such an individual perform that past work? (Tr. 51-
> 52).

The VE testified that the above-stated limitations would preclude Plaintiff's former work but would allow for the medium, unskilled work of a cleaner (1,500 positions in the regional economy) and machine operator feeder tender (700) (Tr. 52-53). The VE testified that a limitation to the use of occasional peripheral and distance vision would not change the job findings but if the individual was unable to use "near acuity" vision on an occasional basis, both jobs would be eliminated (Tr. 57-58). The ALJ then amended the hypothetical limitations, restricting the individual to exertionally light work with the following additional limitations:

> "[N]o climbing ladders, ropes or scaffolds, occasionally climbing ramps or
> stairs. Occasional balance, stoop, crouch, kneel and crawl . . . . avoiding
> concentrated use of hazardous moving machinery, all exposure to
> unprotected heights. . . . [limited to] simple, routine and repetitive tasks
> performed in a work environment free of fast paced production, involving
> only simple work related decisions with few if any workplace changes.
> Occasional interaction with the general public, occasional interaction with
> co-workers, no tandem tasks.

In response, the VE testified that the amended hypothetical question would allow for the work of a housekeeping cleaner (900); inspector/sorter (700); and production worker (2,500) (Tr. 54).

### D.  The ALJ's Decision

Citing the medical records, ALJ Rabaut found that Plaintiff experienced the severe impairments of "diabetes and depression" but that none of conditions met or medically equaled a "listed impairment" under 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15). He found that Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 16). The ALJ found that Plaintiff had the residual functional capacity ("RFC") for exertionally medium work with the following restrictions through the date last insured of December 31, 2007:

> [C]laimant can never climb ladders, ropes or scaffolds.  The claimant should avoid concentrated use of moving machinery and all exposure to unprotected heights.  The claimant is limited to low stress work, defined as having only occasional decision making requirements and changes in the work setting (Tr. 17).

Citing the VE's testimony, the ALJ concluded that the RFC would allow Plaintiff to work as a cleaner or machine operator (Tr. 21-22, 51-52).

The ALJ discounted Plaintiff's alleged degree of limitation.  He found that the allegations of hand and foot tingling and numbness were unsupported by the treating records from the relevant period (Tr. 20).  He cited February, 2007 hospital records noting a normal gait (Tr. 20).  He noted that Plaintiff's blood sugar levels were well controlled with medication (Tr. 20).  He observed that the record did not show "abnormal psychiatric signs of behavior, affect, thought, memory, orientation, and contact with reality that are normally associated with intense and disabling psychiatric symptoms" (Tr. 20).  The ALJ cited

Plaintiff's self-reported daily activities which included meal preparation, managing finances, doing crossword puzzles, grocery shopping, and visiting her grandchildren (Tr. 20).

### III.   STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6ᵗʰ Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6ᵗʰ Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff argues that the ALJ erred by finding that her knee and eye conditions did not create work-related limitations. *Plaintiff's Brief, Docket #19.* She faults the ALJ for omitting these conditions at Step Two of the sequential analysis. *Id.*  She requests a remand for further factual development regarding the effect of the knee and eye conditions on the RFC and hiring of a medical expert to determine the significance of the 1998 knee xrays and the 2004

diagnosis of diabetic retinopathy.  *Id.* at 10, 12-13.  She alternatively requests an award of benefits.  *Id.* at 13.

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir.1985). At Step Two, a condition can be deemed "not severe ... only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Id.* at 90 (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).  20 C.F.R. § 404.1521(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities."  *See also* SSR 85-28 1985 WL 56856,*3 (1985)(same).  "Basic work activities" include the physical functions "such as walking, standing, sitting" as well as the capacity for "seeing, hearing, and speaking." § 404.1521(b)(1-2).  Despite the low bar for qualification as a "severe" impairment, the omission of an impairment causing work-related limitations at Step Two is of "little consequence," provided that the ALJ considers "all impairments" in crafting the RFC. *Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 803, 2003 WL 21949797, * 1 (6th Cir. August 11, 2003).

While the present transcript shows that Plaintiff experienced significant knee and visual limitations, neither the Step Two findings nor RFC (aside from postural and

-11-

environmental limitations) addresses the conditions.

### A. The Knee Condition

The ALJ noted that none of the medical records created between January 30, 2002 and the December 31, 2007 expiration of benefits reference the knee condition (Tr. 18-19). However, the transcript shows that Plaintiff was diagnosed with degenerative arthritic changes of the knee as early as 1998 and received steroid injections until November, 2000 (Tr. 386-391). Plaintiff's testimony that her work requirements were modified in 1998 or 1999, allowing her to sit and work at a computer until her termination in January, 2002 is consistent with the medical records.

The fact that Plaintiff did not receive treatment for the knee condition between January, 2002 and December, 2007 does not establish that the condition did not create work-related limitations. However, Plaintiff did not receive *any* medical treatment well over the first two years for the relevant period despite uncontrolled glucose levels and eye problems. Her financial constraints for the roughly six-year period under consideration are well documented in the treating records (Tr. 232, 249, 347). Pursuant to SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See also* SSR 82–59, 1982 WL 31384, *4 (1982) (The ALJ must

consider an individual's claim that she is unable to afford the prescribed treatment).

While the ALJ at one point parroted Plaintiff's testimony that her treatment was compromised by financial constraints (Tr. 18), he did not acknowledge that the fairly sparse medical history was attributal to her monetary problems, despite the evidence that Plaintiff delayed critically needed treatment during the relevant period. For example, the 2004 treating records show that Plaintiff experienced uncontrolled diabetes with the symptom of vision impairment due to her failure to receive treatment for over one year (Tr. 232-233). April, 2006 treating records state that Plaintiff was unable to afford lab tests (Tr. 249).

Further, common sense dictates that the *degenerative* condition of arthritis of the knee did not improve between the 1998 diagnosis and when diagnostic studies taken after the relevant period showed that the condition had deteriorated (Tr. 267, 276, 360). Standing alone, the early imaging studies, steroid injections, and testimony that she required work restrictions prior to the alleged onset date contradict the finding that she could later walk all day as required for medium work (Tr. 32). Plaintiff testified that even before ceasing work, she was not able to perform the walking requirements of medium work. *Id.* While the ALJ declined to credit the imaging studies created before the relevant period, there is no indication that the degenerative condition of osteoarthritis went into spontaneous remission, but at most, suggest that Plaintiff's reduced exertional demands subsequent to her retirement made the knee condition temporarily more tolerable. The fact that Plaintiff did not seek professional treatment for the knee condition is reasonably attributable to her ability to

-13-

change position at will after losing her job and staying home all day, combined with her financial limitations.

Although the transcript could arguably support the finding that she could perform either sedentary or light work, Plaintiff's testimony and the medical evidence created before and after the relevant period stands at odds with the RFC for medium work. "A full range of medium work requires standing or walking, off and on, for a total of approximately *six* hours in an eight-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." SSR 83-10, 1983 WL 31251, *6 (1983) (Emphasis added). "In most medium jobs, *being on one's feet for most of the workday is critical*." *Id.* (Emphasis added). The records created prior to the alleged onset date and Plaintiff's testimony indicate that as of January 30, 2002, she was already unable to perform medium work.

The ALJ cited February, 2007 emergency room treatment records for syncope showing a steady gait to support his finding that she did not experience knee problems for the relevant period (Tr. 20, 213). However, Plaintiff's ability to walk for a few yards without fainting does not establish that her knee problems resolved for the relevant period or that she was capable of walking and standing for most of an eight-hour workday. Moreover, the February, 2009 emergency treatment for dizziness was wholly unrelated to the chronic condition of arthritis and none of the hospital records indicate that the knee condition was independently evaluated. Plaintiff's testimony, the well-documented degenerative

-14-

condition, and the post expiration records wholly undermine the ALJ's finding that Plaintiff could suddenly stand and walk for "most of the workday" for the interim period.

**B. The Eye Condition**

The RFC also omits all mention of limitations in vision. In regard to the eye treatment, the ALJ noted only that Plaintiff reported double vision in March, 2004 and in May, 2004, reported that her vision was "better" (Tr. 19).

While the VE's job testimony cited in the administrative opinion allowed Plaintiff to use peripheral and distance vision occasionally (Tr. 21, 57-58), the medical records pertaining to the relevant period and Plaintiff's testimony indicate that she experienced additional visual limitations. Ophthalmologist Dr. Gupta's July, 2011 records state that he examined her in March, 2005 but that Plaintiff had not kept followup appointments due to financial limitations (Tr. 347).[2] Dr. Gupta's comment that Plaintiff failed to follow through with treatment in March, 2005 is consistent with Dr. Haque's notes from the same month stating that Plaintiff was scheduled for (but apparently did not follow through with) bilateral eye surgery (Tr. 240). Dr. Haque's 2012 statement that Plaintiff experienced diabetic retinopathy during the relevant period is also consistent with the contemporaneous treating records and Dr. Gupta's 2011 comments (Tr. 383-384). Plaintiff's testimony that she was able to see (but not read the large letters of a reading chart) at the time of the hearing (after October, 2011 retinopathy surgery) does not support the finding that during the relevant

_____

[2]The transcript does not contain Dr. Gupta's 2005 records.

period, she was capable of work involving even occasional peripheral and distance vision (Tr. 325).  Notably, the VE testified that the inability to perform "near acuity tasks" on an occasional basis would eliminate all of the exertionally medium job findings (Tr. 57-58). Because Dr. Gupta's July, 2011 reference to Plaintiff's March, 2005 condition establishes that Plaintiff experienced eye conditions requiring surgery as early as 2005,  a remand is required for determination of the visual limitations occurring within the relevant period.

Upon remand, the ALJ will recontact Dr. Gupta for determination of Plaintiff's visual limitations for the period in question.  It is well established that "after weighing the evidence," the ALJ may seek "additional evidence or clarification" if s/he "cannot reach a conclusion about whether" the claimant is disabled. 20 C.F.R. § 404.1520b(c)(1).  The Court is mindful that recontacting a medical source is appropriate "only if the evidence received from that source is inadequate for a disability determination." *DeBoard v. Commissioner of Social Sec.,* 2006 WL 3690637, *5 (6th Cir. December 15, 2006); § 404.1512(e) and that "[a]bsent a gap in the record, the ALJ has no duty to recontact the physician." *Starkey v. Commissioner of Social Sec.,* 2008 WL 828861, *4 (W.D. Mich. March 26, 2008) (*citing Johnson v. Barnhart,* 138 Fed. Appx. 186, 189, 2005 WL 1414406, *3 (11th Cir. June 17, 2005)).

However here, the record strongly supports the need to recontact Dr. Gupta to ascertain Plaintiff's visual limitations prior to December 31, 2007.   First, the ability to evaluate Plaintiff's condition between 2002 and the end of 2007 is already hampered by the

paucity of treatment records and the fact that the period under consideration ended five years before the administrative hearing. While Dr. Gupta's 2011 records make reference to his 2005 treatment, none of Dr. Gupta's records for the relevant period are contained in the transcript. At a minimum, the ALJ is required to address the "gap" in the records. Second, the ALJ's discussion of the vision problems was limited to the one observation that Plaintiff reported double vision in March, 2004 and that the condition improved as of May, 2004. However, he failed to discuss or even acknowledge Dr. Gupta's 2011 comment that Plaintiff required eye surgery in 2005 and that the surgery was canceled due to her financial constraints rather than an improvement in her condition. If the ALJ is unable to recontact Dr. Gupta for an assessment of Plaintiff's eye limitations between 2002 and the end of 2007, he will consult a medical expert for an assessment of the condition prior to the expiration of benefits.

### C. Remand

Both of the above discussed issues provide grounds for remand. The final question is whether to remand for further fact-finding or an award of benefits. The Sixth Circuit has held that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171 (6th Cir.1994).

### 1. Plaintiff is Entitled to Benefits as of Her 55th Birthday

As discussed in Section **A.**, neither the medical record nor Plaintiff's testimony

-17-

support the finding that she was capable of exertionally medium work.   The pertinent regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 2., Rule 202.06., directs a finding of disability for an individual 55 or over (advanced age) who is limited to exertionally light or sedentary, unskilled work.  Plaintiff turned 55 on November 3, 2005 and as such, is entitled to benefits from that time forward.

### 2.  A Remand Warranted for Evaluation of Plaintiff's Condition Between January 30, 2002 and November 2, 2007

In contrast, Plaintiff has established a strong but not overwhelming case for benefits between January 30, 2002 and November 2, 2007, at which time she was categorized  as "closely approaching advanced age" (age 50 to 55).  In the "closely approaching" age group, a finding that Plaintiff was limited to exertionally unskilled sedentary work would  result in a disability finding.  20 C.F.R. part 404, subpart P, App. 2, Rule 201.14.  However, because it cannot be said that the evidence overwhelmingly supports the finding that Plaintiff is unable to perform exertionally *light* work, a remand for further-factfinding is appropriate for further evaluation of her exertional capabilities.  In addition, as discussed in Section **B.**, upon remand, the ALJ will recontact Dr. Gupta or alternatively, a medical expert for an assessment of Plaintiff's visual limitations for the period in question and make a determination of how such limitations impacted her work capabilities.

## VI.   CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment [Dock. #20] is DENIED and Plaintiff's Motion for Summary Judgment [Dock. #19] is GRANTED, remanding for an award of benefits as of Plaintiff's 55th birthday, and remanding for further fact-finding and a determination of whether Plaintiff was capable of exertionally light work between the alleged onset of disability date and her 55th birthday.

**IT IS SO ORDERED.**


                              s/ R. Steven Whalen
                              R. STEVEN WHALEN
                              UNITED STATES MAGISTRATE JUDGE
Dated:  September 26, 2016




## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on September 26, 2016, electronically and/or by U.S. mail.

                              s/Carolyn M. Ciesla
                              Case Manager to the
                              Honorable R. Steven Whalen

-19-